1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

10   GUILLERMO NUNO,                        No.  1:21-cv-00769-KES-SAB (PC)

11                    Plaintiff,            FINDINGS AND RECOMMENDATIONS
                                            REGARDING DEFENDANTS' MOTION
12        v.                                FOR SUMMARY JUDGMENT

13   D. ESLICK, et al.                      (ECF No. 82)

14                    Defendants.

15        Plaintiff is proceeding pro se and in forma pauperis in this action filed pursuant to 42

16   U.S.C. § 1983.

17        Currently before the Court is Defendants' motion for summary judgment, filed March 8,

18   2024.

19                                          **I.**

20                                    **BACKGROUND**

21        This action is proceeding on Plaintiff's deliberate indifference claims against Defendants

22   Eslick and Flores and retaliation claims against Defendants Eslick, Satterfield and Flores.  (ECF

23   No. 21.)

24        Defendants filed an answer to the original complaint on January 18, 2022.  (ECF No. 30.)

25   On January 26, 2022, the Court set the case for settlement conference on April 12, 2022.  (ECF

26   No. 31.)  However, on March 22, 2022, Defendants filed a notice to opt-out of the settlement

27   conference which was granted this same day.  (ECF Nos. 36, 37.)  On this same day, the Court

28

1    issued the discovery and scheduling order.  (ECF No. 38.)

2         On May 5, 2023, the Court granted Plaintiff's motion to amend the complaint and his first

3    amended complaint was filed this same date.  (ECF Nos. 54, 55.)

4         On May 15, 2023, Defendant Satterfield filed an answer to the first amended complaint,

5    and Defendants Eslick and Flores filed the instant motion to dismiss.  (ECF Nos. 56, 57.)  An

6    amended motion to dismiss was filed on May 16, 2023.  (ECF No. 60.)

7         On July 5, 2023, Plaintiff filed an opposition and motion to amend the complaint, along

8    with a proposed second amended complaint which was lodged.  (ECF Nos. 67, 68.)   Defendants

9    filed a reply on July 19, 2023.  (ECF No. 69.)

10         On July 25, 2023, Findings and Recommendations were issued recommending denial of

11    Defendants' motion to dismiss and denial of motion to amend as unnecessary.  (ECF No. 70.)

12    The Findings and Recommendations were adopted in full on August 20, 2023.  (ECF No. 71.)

13         On September 12, 2023, Defendants Eslick and Flores filed an answer to the operative

14    complaint.  (ECF No. 72.)

15         On September 13, 2023, the Court issued an amended scheduling order, which was

16    modified in part on December 12, 2023.  (ECF Nos. 73, 75, 77.)

17         On March 8, 2024, Defendants filed the instant motion for summary judgment.  (ECF No.

18    82.)  Plaintiff filed an opposition on August 2, 2024.  (ECF No. 106.)  Plaintiff filed supplements

19    to the opposition on August 9, 2024 and August 22, 2024.  (ECF Nos. 107, 108.)  Defendants

20    filed a reply on September 20, 2024.  (ECF No. 109.)

21         On October 4, 2024, Plaintiff filed a motion for leave to file a sur-reply, which was

22    granted on November 8, 2024.  (ECF Nos. 110, 111.)

23    **II.**

24    **LEGAL STANDARD**

25    **A.    Summary Judgment Standard**

26         Any party may move for summary judgment, and the Court shall grant summary judgment

27    if the movant shows that there is no genuine dispute as to any material fact and the movant is

28    entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted);

_Washington Mut. Inc. v. U.S._, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); _Carmen v. San Francisco Unified Sch. Dist._, 237 F.3d 1026, 1031 (9th Cir. 2001); _accord Simmons v. Navajo Cnty., Ariz._, 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, _Soremekun v. Thrifty Payless, Inc._, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, _Comite de Jornaleros de Redondo Beach v. City of Redondo Beach_, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### III.

### DISCUSSION

#### A.    Summary of Plaintiff's Complaint

Beginning in August 2019, Eslick would exclaim to Plaintiff: "faggot," "you got a small penis," "go suck," "masturbatory," aimed at Plaintiff to hear and also intended to incite violence. Defendant Eslick know that such statements can incite violence against Plaintiff when overheard

by another inmate yet chose to make the verbal statements toward Plaintiff whenever the opportune time would occur.  Such harassment continued and exacerbated with statements exclaimed to Plaintiff: "piece of shit," "watch your back," "I'll get you off the yard," "I'm going to get you knocked out"!  Eslick used the prison jargon terminology "piece of shit" to infer that Plaintiff is a child molester, intending for other inmates to overhear the remarks with the implication Plaintiff is a child molester—thereby becoming a target by inmates that will attack Plaintiff hearing about the offense from correctional officers.  Inmates would believe such exclamations spoken.

Defendant D. Eslick purposefully and deliberately influenced many of the Sierra Conservation Center staff to commit various deeds of misconduct against Plaintiff.  Plaintiff will prove such has repeatedly occurred with over 200 pages of documentations of the evidence, as well as fellow inmate witnesses.

Plaintiff has during all times of being subjected to these many instances of harassment abuse made verbal and written grievances to Defendant Eslick's superiors, as well as the many additional medical personnel involved that have taken reprisals against Plaintiff.  The immediate results of Plaintiff's reports were met only with additional reprisals taken, with no result expected by Plaintiff pursuant to due process of law.

It is further alleged that Plaintiff has become at risk of harm as a direct result of the Defendant's unlawful harassment and unlawful influence of other staff persons at Sierra Conservation Center.

Defendant Satterfield became aware that Plaintiff initiated the process necessary to exhaust the administrative remedies involving Defendants Eslick and Flores.  Plaintiff had to legally pursue the CDCR 22 request form procedure.  Plaintiff had to write complaints upon Eslick's misdeeds and obtain replies from Eslick's supervisors.  Defendant Satterfield became aware of these complaints and began to purposefully subject Plaintiff to extreme harassment tactics.

On February 16, 2020, while Plaintiff was attending religious services, Satterfield stalked and located Plaintiff, walked Plaintiff into a holding cell area of the prison away from view of

1    everyone, and forced Plaintiff to remove all of his clothing for a so-called strip search in which no

2    cause existed.  Satterfield told Plaintiff: "you're going to the hole!"—inferring that Plaintiff

3    would be moved to administrative segregation.  Satterfield began remarking to Plaintiff, "you

4    keep writing up 602's (inmate appeals) on Eslick and other officers here.  Plaintiff became

5    nervous and feared officer Satterfield.  Satterfield then had Plaintiff moved from his housing unit

6    into another to create further turmoil for Plaintiff.  Satterfield then instigated his supervisor

7    lieutenant Bullock to actually place Plaintiff in administrative segregation on February 13, 2021.

8    It was subsequently determined that Plaintiff was wrongly placed in administrative segregation.

9    Although Plaintiff had concerns about his safety, it was because correctional staff were harassing

10   him.  Satterfield engaged in unconstitutional actions against Plaintiff in retaliation for his

11   previous grievances against officers Eslick and Flores.

12        Throughout February and March 2021, Satterfield continued to stalk Plaintiff telling him,

13   "you keep it up (filing the 602 complaints) and you will next be in a plastic bag!"

14        Defendant Flores became aware that Plaintiff had initiated the process necessary to

15   exhaust the administrative remedies involving Defendants Eslick and Satterfield.  Plaintiff had to

16   first pursue the CDCR 22 request form procedure by writing complaints about Eslick and

17   Satterfield's misdeeds.  Defendant Flores became aware of these complaints written against her

18   fellow officers, and began to purposely subject Plaintiff to harassment techniques.

19        On October 17, 2019, as Plaintiff was walking past Defendant Flores, she loudly

20   exclaimed so other inmates could hear: "you're a fucking piece of shit!!"  Defendant Flores yelled

21   this verbiage knowing that inmates overhearing such would accept it as a true account that

22   Plaintiff is a sex offender, thereby placing him at risk of assault or being killed by other inmates.

23   Defendant Flores then informed Defendant Satterfield about her provocation of Plaintiff, and

24   Satterfield again threatened Plaintiff not to file an inmate grievance against Flores.

25        **B.    Statement of Undisputed Facts[1]**

26        1.    Plaintiff Guillermo Nuno is currently housed at Pelican Bay State Prison and

27   serving a forty-six year sentence for: (1) two counts of rape with force/ violence/fear of bodily

---

[1] Hereinafter referred to as "UF."

injury; (2) corporal injury on spouse within seven years of prior specified conviction; (3) two counts of false imprisonment; (4) two counts of false imprisonment with violence; (5) infliction of corporal injury on spouse/cohabitant; (6) criminal threat to cause great bodily injury/ death; (7) assault with a deadly weapon; and (8) prevent/dissuade victim/witness. (Declaration of A. Heusel (Heusel Decl.) ¶ 5.)

2.      Due to his sex-offense related crimes, Nuno is assigned an "R" suffix classification which indicates that he is a sex offender pursuant to Penal Code Section 290. (Heusel Decl. ¶¶ 3, 6.)

3.      Nuno was housed at Sierra Conservation Center (SCC) from May 9, 2018, to August 23, 2021, and assigned to Facility C, which was a Level III Sensitive Needs Yard (SNY), until May 1, 2021, when it became a Non-Designated Programing Facility (NDPF). (Heusel Decl. ¶¶ 2, 7.)

4.      Officer D. Eslick worked as a correctional officer for the California Department of Corrections and Rehabilitation (CDCR), at SCC from September 27, 2004, until she retired on January 17, 2022. (Declaration of Officer Eslick (Eslick Decl.) ¶ 1.)

5.      Officer J. Flores worked as a correctional officer for CDCR, at SCC from November 16, 2015, to January 30, 2022, and on January 31, 2022, she was promoted to Sergeant, a position she holds to the present.[2] (Declaration of Officer Flores (Flores Decl.) ¶ 1.)

6.      Officer D. Satterfield has worked as a correctional officer for CDCR at SCC from February 2, 2010, to the present. (Declaration of Officer Satterfield (Satterfield Decl.) ¶ 1.)

7.      Each defendant served Requests for Production of Documents to Plaintiff, asking Nuno to produce all records in his possession, custody and control to support his claims against Defendants. (Defendant Eslick's Requests for Production to Plaintiff, Set One; Defendant Satterfield's Requests for Production to Plaintiff, Set One; Defendant Flores's Requests for Production to Plaintiff, Set One, attached collectively as Ex. A to the Declaration of Nilufar K. Majd (Majd Decl.) ¶ 2.)

8.      Plaintiff was not able to identify the name of the inmate who allegedly attacked him. (Pl. Dep. at 52:20-22, Ex. D; Majd Decl. ¶ 5.)

---

[2] The Court refers to Defendant Sergeant Flores as Office Flores, her title at all times relevant to this action.

9.      Plaintiff did not seek medical treatment for the alleged attack by this unknown inmate.  (Pl. Dep. at 53:12-14, Ex. D; Majd Decl. ¶ 5.)

10.      Plaintiff testified that the assault by this unknown inmate took place in the Facility C workout area, where both he and the unknown inmate were housed.  (Pl. Dep. at 54:20-25, 55:15-25, Ex. D; Majd Decl. ¶ 5.)

11.      Plaintiff testified that this unknown inmate "just comes up behind me or to the side of me and just gives me a punch to the side of my head and like I said it was kind of a like a warning…and he said you keep talking your mouth and that is how I connected.  He said you keep complaining or you keep talking to the officer something along those lines… you piece of shit." (Pl. Dep. at 57:9-22, Ex. D; Majd Decl., ¶ 5.)

12.      Plaintiff admitted that there were officers and inmates on the yard when this assault occurred, but there were no "get down" when this attack occurred, because the officers "weren't looking."  (Pl. Dep. at 55:5-14, 57:23-58:2, Ex. D, Majd Decl. ¶ 5.)

13.      Plaintiff testified that despite being punched in the head, he did not report the incident to any medical or prison staff.  (Pl. Dep. at 58:15-21, Ex. D; Majd Decl., ¶ 5.)

14.      At his deposition, Plaintiff only identified one inmate witness, Inmate Moreno, by name who he claims may have heard some of Officer Eslick's derogatory statements to Plaintiff.

15.      Inmate F. Moreno (D10020) was Plaintiff's cellmate from May 26 to June 25, 2021, in Facility C at SCC.  (Declaration of Counselor J. Toubeaux (Toubeaux Decl.), ¶ 4.)

16.      During the time Plaintiff was housed at SCC, Officer, Eslick was assigned as a Yard Officer on Facility C, at SCC.  (Eslick Decl. ¶ 4.)

17.      As a Yard Officer, among her many job duties, Officer Eslick was responsible for patrolling and supervising inmate movements on the prison yard to ensure that inmates were complying with prison rules, and to preserve the safety and security of inmates, prison staff and the institution.  (Eslick Decl. ¶ 4.)

18.      Plaintiff testified Officer Flores became aware that Plaintiff initiated the grievance process against Officers Satterfield and Eslick because he spoke with Officer Flores on a "couple occasions."  (Pl. Dep. at 128: 8-21, Ex. D; Majd Decl., ¶ 5.)

19.    Plaintiff testified that he may have had two or three negative interactions with Officer Flores during the time he was incarcerated at SCC.  (Pl. Dep. at 125:16-21, Ex. D; Majd Decl., ¶ 5.)

20.    Plaintiff testified that he had his first interaction with Officer Flores in October 2019 and was unable to identify the next interaction he had with her but had written it down in the documents he created with someone else.  (Pl. Dep. at 128:22-129:2, Ex. D; Majd Decl., ¶ 5.)

21.    Plaintiff testified that sometime in October 2019, Officer Flores walked by Plaintiff's cell while he was sitting on his bed and called him "a piece of shit out loud."  (Pl. Dep. at 125:22-126:4, 127:7-13, Ex. D; Majd Decl., ¶ 5.)

22.    Plaintiff did not recall any other specific encounters where Officer Flores made derogatory comments to him.  (Pl. Dep. at 129:20-130:3, Ex. D; Majd Decl., ¶ 5.)

23.    From August 2019 to October 2020, Officer Flores was assigned as a Relief Officer on Facility C, at SCC where she filled various job assignments as needed.  (Flores Decl., ¶ 4.)

24.    From October 2020 to August 2021, Officer Flores was assigned as a Visiting Process Officer, on the main side of the prison, at which time she had no interactions with inmates, including Plaintiff.  (Flores Decl., ¶ 4.)

25.    As a Facility C Relief Officer from August 2019 to October 2020, Officer Flores had limited interactions with Plaintiff.  (Flores Decl., ¶ 4.)

26.    In 2020, during Facility C yard programming, there were numerous officers on the yard who observed and monitored inmate activities, including an Observation Tower Officer who monitored the yard and an officer who monitored cameras footage of inmate activities on the yard.   (Declaration of Dewoody (Dewoody Decl.) ¶ 3.)

27.    In 2020, there were between 12 to 15 correctional officers, including but not limited to Security Patrol Officers, Yard Officers, Medical Officers, on the yard during Facility C yard programing who observed and monitored inmate activities. (Dewoody Decl. ¶ 3.)

28.    In 2020, an Observation Tower Officer who had full view of the Facility C yard monitored yard programming on Facility C at all times.  (Dewoody Decl. ¶ 3.)

///

29.    In 2020, a Control Booth Officer was assigned to each building in Facility C to monitor the camera footage of the Facility C yard as part of the Control Booth Officer's job responsibilities; there were also two additional towers with officers monitoring the Facility C yard, as well as the prison gates.  (Dewoody Decl. ¶ 3.)

30.    If any one of the numerous prison staff present on and monitoring the Facility C yard witnessed an inmate-on-inmate attack, it is to be documented as an Incident Report, and placed both in the victim inmate and attacker inmate's respective central files via the Strategic Offender Management System (SOMS).  (Dewoody Decl. ¶ 4.)

31.    A review of Plaintiff's SOMS records does not reveal that he was involved in any inmate-on-inmate attack in 2020, while housed at SCC.  (Dewoody Decl. ¶ 5.)

32.    Plaintiff testified that during the relevant time of his FAC, he was housed in Facility C, an SNY, at SCC, where inmates with sex offenses and child molestation charges are also housed.  (Pl. Dep. at 30:6-12, Ex. D; Majd Decl., ¶ 5.)

33.    During the relevant time to the FAC, Facility C was designated as an SNY, which comprised of inmates who were particularly vulnerable and required special protection from the general inmate population.  (Heusel Decl., ¶¶ 2-3.)

34.    These SNYs were intended to house inmates who had been designated as "sensitive needs" based on cited, documented, and verified information that, for safety and security reasons, an inmate had to be housed on a yard separate from the general population.  (Heusel Decl., ¶ 3.)

35.    Initial criteria for the sensitive-needs designation focused on inmates documented as high notoriety based on their crimes, past victims directly related to a crime, informants and/or gang drop-outs.  (Heusel Decl., ¶ 3.)

36.    Included in these sensitive-needs populations generally, were inmates who had "R" suffix custody designations, which were affixed to an inmate's custody designation to ensure the safety of inmates, staff and the public by identifying inmates who have a history of specific sex offenses as outlined in Penal Code Section 290.  (Heusel Decl., ¶ 3.)

37.    During the relevant time period of the FAC, Facility C housed inmates with documented histories of sex offenses, including domestic violence, rape and child molestation.

1    (Heusel Decl. ¶ 7.)

2         38.    Plaintiff is designated as a violent sex-offender, and upon arrival to SCC, he was

3    classified to be housed in Facility C with inmates who have similar sex-offense designations.

4    (Heusel Decl. ¶¶ 5-7.)

5         39.    Placing inmates with certain sex-offense convictions, such as rape or child

6    molestation in general population housing could potentially pose safety risks to those sex-offender

7    inmates, including assault and physical violence.  (Heusel Decl. ¶ 8.)

8         40.    During the time Plaintiff was housed at Facility C, as Facility C was in part

9    comprised of inmates convicted of various sex offenses, including rape, child molestation, or other

10   sex-related crimes, any inference made by anyone that any particular inmate was a child molester

11   would generally not present a security risk to that inmate in the Facility C inmate population.

12   (Declaration of Lt. M. Bullock (Bullock Decl.) ¶ 7; Heusel Decl. ¶ 9.)

13        41.    Because inmates with sex-related criminal convictions and other sensitive

14   background considerations were present on that yard, it is well-known among the inmate population

15   that persons with child-sex offenses could be there.  (Bullock Dec. § 7.)

16        42.    Plaintiff testified that he made verbal complaints to Sgt. Tague in August or

17   September of 2019, that Officer Eslick was discriminating against Plaintiff for a job opening that

18   Plaintiff was next in line to receive, but officer Eslick assigned that job to a newer inmate. (Pl. Dep.

19   at 75:16-76:15 [Beginning at "So when was…"], Ex. D, Majd Decl. ¶ 5.)

20        43.    Plaintiff testified that officer Eslick played a role in his ability to get this job

21   opening because unknown "officers and clerks" told Plaintiff that Officer Eslick had influence over

22   job assignments as she had a "personal relationship with the Supervisor…at Sierra Conservation."

23   (Pl. Dep. 76:16-78:1, Ex. D, Majd Decl. ¶ 5.)

24        44.    Plaintiff testified that he never filed a grievance concerning officer Eslick's alleged

25   discrimination and failure to assign him to the desired job placement, instead he made a verbal

26   complaint to Officer Eslick's supervisor, Sgt. Tague.  (Pl. Dep. 80:3-11, [Beginning, "So at that

27   point…"], Ex. D, Majd Decl. ¶ 5.)

28   ///

45.     Sgt. Tague was Officer Eslick's immediate supervisor, when she worked as a Correctional officer in Facility C, at all relevant times to the FAC. (Tague Decl., ¶ 3.)

46.     Sgt. Tague recalls Plaintiff made multiple and frequent complaints about multiple officers on Facility C, however, due to the passage of time, Sgt. Tague does not recall any specific complaints Plaintiff made against Officer Eslick.  (Tague Decl. ¶ 6.)

47.     Plaintiff testified that when Officer Satterfield became aware that Plaintiff submitted appeals against the other defendants, Officer Satterfield harassed Plaintiff on February 16, 2020. (Pl. Dep. 102:4-9, Ex. D, Majd Decl. ¶ 5.)

48.     Plaintiff testified that on February 16, 2020, no one was present when Officer Satterfield conducted an unclothed body search on Plaintiff so that Officer Satterfield could look and laugh at Plaintiff.  (Pl. Dep. 112:16-113:4, Ex. D, Majd Decl. ¶ 5.)

49.     Plaintiff testified that after the February 16, 2020 unclothed body search, Officer Satterfield threatened Plaintiff with segregation but then sent him back to his cell instead.  Pl. Dep. 115:8-18, Ex. D, Majd Decl. ¶ 5.)

50.     Plaintiff testified that nearly one year later, on February 13, 2021, "Supervisor Bullock" fabricated a reason to put Plaintiff in segregation, and that "Bullock and Satterfield obviously ha[d] been speaking to each other…they discussed me and they [ ] discussed my court litigation and grievances that I have been doing while I was getting help from other inmates."  (Pl. Dep. 118:2-119:4, Ex. D, Majd Decl. ¶ 5.)

51.     Plaintiff testified that Lt. Bullock never gave Plaintiff a reason for placing him in administrative segregation on February 13, 2021, and he was in administrative segregation for a week to ten days.  (Pl. Dep. 119:9-18, 23-24, Ex. D, Majd Decl. ¶ 5.)

52.     Plaintiff testified that Sgt. Sesma told Plaintiff that he was wrongfully placed in administrative segregation, and he gave him the document that indicated he was wrongfully placed in administrative segregation.  (Pl. Dep. 121:8-122:2, Ex. D, Majd Decl. ¶ 5.)

53.     Plaintiff testified that he was moved from Building 1 to Building 5 because he "kept complaining of Satterfield" but did not know when he moved from Building 1 to Building 5. (Pl. Dep. 123:1-15, Ex. D, Majd Decl. ¶ 5.)

54.     Officer Satterfield was assigned as Facility C Security Patrol Officer from August 2019 to February 2020.  (Satterfield Decl. ¶ 4.)

55.     Based on his review of the FAC, Officer Satterfield vaguely recalled conducting an unclothed body search on Plaintiff on February 16, 2020, in the Facility C program office, where unclothed body searches are conducted.  (Satterfield Decl. ¶ 12.)

56.     A licensed vocational nurse or registered nurse would also be called to conduct an examination of the inmate after the unclothed body search was performed, as a precaution to ensure that the officer conducting the search did not injure the inmate; the nurse would note any injuries in a CDCR Form 7219, along with an ASU pre-placement form in the event the inmate needed to be placed in ASU housing for his safety, and/or the safety of the institution.  (Satterfield Decl. ¶ 12; Bullock Decl. ¶ 13.)

57.     Upon his investigation, Sgt. Sesma prepared a CDC 128-B General Chrono, advising Plaintiff that his safety concerns were unfounded and unsubstantiated, and Plaintiff was then released from ASU housing back to Facility C housing on February 18, 2020.  (Sesma Decl. ¶¶ 7-8; Bullock Decl. ¶ 18; Ex. I, Toubeaux Decl. ¶ 15.)

58.     Plaintiff's records confirm he was housed in C3-148L on April 8, 2020 for quarantine based on being symptomatic for Influenza Like Illness/ COVID-19 and was released and moved back to Building 1, Cell 118 after completing quarantine on April 14, 2020. (Declaration of Captain R. Jauregui (Jauregui Decl.) ¶ 4.)

59.     On April 20, 2020, Plaintiff was moved from Building 1 to 5 to make room for more quarantine space during the COVID-19 pandemic.  (Jauregui Decl. ¶¶ 4-5.)

60.     Plaintiff remained in Building 5 in various cells until his transfer to Pleasant Valley State Prison, with one move into the former ASU on February 13-February 18, 2021.  (Jauregui Decl. ¶ 5.)

61.     None of Plaintiff's movements appeared to be out of the ordinary while he was housed at SCC, rather, the movements were incident to prison operations and to make space for isolation and quarantine releases during the pandemic.  (Jauregui Decl., ¶¶ 6-7.)

///

62.     On February 20, 2020, Plaintiff submitted Appeal No. SCC-X-20-01028 against Officer Eslick, claiming he received an RVR issued by Officer Eslick in retaliation for complaining of harassment and intimidation by Officer Eslick.  (Plaintiff's 602-Appeal No. SCC-X-20-01028, Ex. J, Toubeaux Decl. ¶ 18.)

63.     Plaintiff submitted Appeal No. SCC-20-01028 to the second level of institutional review.  (Toubeaux Decl. ¶ 18.)

64.     On February 20, 2020, Plaintiff submitted Appeal No. SCC-X-20-01030 against Officer Satterfield, claiming he received an RVR issued by Officer Satterfield to retaliate against him.  (Plaintiff's 602-Appeal No. SCC-X-20-01030, Ex. K, Toubeaux Decl. ¶ 19.)

65.     Plaintiff submitted Appeal No. SCC-X-20-01030 to the second level of institutional review.  (Toubeaux Decl. ¶ 19.)

66.     On February 20, 2020, Plaintiff submitted Appeal No. SCC-X-20-01031, against Officer Flores, claiming Officer Flores changed the truth in what was reported in her RVR that she issued to Plaintiff, further claiming this RVR was issued in retaliation for complaints he previously filed; in his appeal, Plaintiff also claimed the Senior Hearing Officer who reviewed the RVR twisted his words and made up his mind prior to the RVR hearing.  (Plaintiff's 602-Appeal No. SCC-X-20-01031, Ex. L, Toubeaux Decl. ¶ 20.)

67.     Plaintiff submitted 602-Appeal No. SCC-X-20-01031 to the second level of institutional review.  (Toubeaux Decl. ¶ 20.)

68.     On February 20, 2020, Plaintiff submitted Appeal No. SCC-X-20-00786, claiming Facility C Officers Flores, Eslick, Rivera, and Satterfield retaliated against Plaintiff, conspired to write RVRs against him, colluded, were abusive, conducted themselves unethically, and conspired to have him "kicked off the yard"; Plaintiff alleged the actions of the officers caused Plaintiff brain damage and as a result required him to take prescribed medication.  (Plaintiff's 602-Appeal No. SCC-X-20-00786, Ex. M, Toubeaux Decl. ¶ 21.)

69.     Plaintiff submitted CDCR 602-appeal No. SCC-X-20-00786 through a second round of institutional review.  (Toubeaux Decl. ¶ 21.)

///

13

70.     On March 3, 2020, Plaintiff submitted 602-Appeal No. SCC-X-20-00787, claiming Officer Eslick harassed Plaintiff in multiple ways, and made derogatory comments to him of a sexual nature.  (Plaintiff's 602-Appeal No. SCC-X-20-00787, Ex. N, Toubeaux Decl. ¶ 23.)

71.     Plaintiff attempted to submit CDCR 602-appeal No. SCC-X-20-00787 through a second round of institutional review.  (Toubeaux Decl. ¶ 23.)

72.     Plaintiff submitted Appeal Nos. SCC-X-20-01028, SCC-X-20-01031, SCC-X-20-00786 and SCC-X-20-00787 to the Office of Appeals for a third and final level of review. (February 4, 2021 Responses from the OOA, Ex. E, Majd Decl. ¶ 6.)

73.     On May 2, 2020, Plaintiff submitted Grievance No. SCC-X-20-0857, claiming Officer Satterfield continually harassed him since October 17, 2019, when he allegedly told Plaintiff "not to 602 Officer Flores" and lied to the Senior Hearing Officer during his last RVR. (Plaintiff's Grievance No. SCC-X-20-00857, Ex. O, Toubeaux Decl. ¶ 24.)

74.     Plaintiff submitted CDCR 602-Appeal No. SCC-X-20-00857 through two levels of institutional review at SCC.  Plaintiff's Grievance No. SCC-X-20-00857, Ex. O, Toubeaux Decl. ¶ 24.)

### C.     Defendants' Evidentiary Objections

Defendants raise several evidentiary objections to some of the evidence submitted by Plaintiff in opposition to their motion for summary judgment.  In fact, Defendants object to the entirety of Plaintiff's declaration for lack of relevancy, self-serving statements, conclusory, calls for legal conclusion, lack of foundation, lack of personal knowledge, and hearsay.  To the extent the Court necessarily relied on evidence that has been objected to, the Court relied only on evidence it considered to be admissible. The Court does not generally rule on all evidentiary objections individually in the context of summary judgment. "This is especially true when, as here, 'many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence.' " Capital Records, LLC v. BlueBeat, Inc., 765 F.Supp.2d 1198, 1200 n.1 (C.D. Cal. 2010) (quoting Doe v. Starbucks, Inc., 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009)).  To the extent the Court necessarily relied on evidence that has been

1  objected to, the Court relied only on admissible evidence and, therefore, the objection is overruled.[3]

2  **D.    Analysis of Defendants' Motion**

3  Defendants argue that Plaintiff's claims are based on nothing more than uncorroborated

4  allegations. The undisputed evidence shows that Plaintiff cannot satisfy any component of the

5  deliberate indifference test, satisfy any element to support his retaliation claims, or demonstrate his

6  entitlement to punitive damages. Among other things, Plaintiff was not attacked due to any conduct

7  of Defendants and admits to facts that negate both his First and Eighth Amendment claims against

8  Defendants. As Plaintiff cannot point to any competent, admissible evidence to support his claims

9  against Defendants, summary judgment is warranted. Defendants also argue they are entitled to

10  qualified immunity.  (ECF No. 82.)

11  In opposition, Plaintiff argues that there are genuine issues of material fact that Defendants

12  engaged in unconstitutional retaliation and acted with deliberate indifference to his safety.  (ECF

13  No. 106.)

14  In reply, Defendants argue that Plaintiff attempts to defeat summary judgment based on his

15  own uncorroborated, conclusory, self-serving declaration and statements.   While Defendants

16  presented ample evidence showing no genuine dispute of fact, Plaintiff has failed to offer any

17  competent, admissible evidence to overcome summary judgment.  (ECF No. 109.)

18  In response, Plaintiff argues that his declaration is presumed true and provides competent

19  evidence to raise a genuine issue of material fact to support his retaliation and deliberate

20  indifference claims.  (ECF No. 110.)

21  1.    Deliberate Indifference to Safety

22  Plaintiff contends that Defendants Eslick and Flores called him a "piece of shit" indicating

---

[3] In addition, any objection to evidence based on relevance of admissibility of form are unnecessary.   Bohnert v. Roman Catholic Archbishop of San Francisco, 136 F. Supp. 3d 1094, 1111 (N.D. Cal. 2015) (declining to consider on summary judgment objections that evidence "lacks foundation, is irrelevant, is inadmissible hearsay, or is responsive to leading questions"); see also Slojewski v. Polam Fed. Credit Union, 473 F. App'x. 534, 536 n. 1 (9th Cir. 2012) (holding district court erred in excluding evidence presented on summary judgment on the basis that it was inadmissible hearsay); Jeffries v. Las Vegas Metro. Police Dep't, 713 F. App'x 549, 549–51 (9th Cir. 2017) (affirming district court's grant of summary judgment to defendant on plaintiff's 42 U.S.C. § 1983 claims and finding district court did not err in considering the exhibits attached to defendant's motion for summary judgment even though some of the exhibits were not authenticated "because a competent witness with personal knowledge could authenticate the exhibits at trial").

1  or suggesting that Plaintiff was a child molester.

2      "A prison official's 'deliberate indifference' to a substantial risk of harm to an inmate

3  violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994).  For allegations of

4  deliberate indifference to safety by a prison official to state an Eighth Amendment claim, they must

5  satisfy two requirements. First, the deprivation or harm suffered by the prisoner must have been

6  "sufficiently serious," that is, "the inmate must show that he is incarcerated under conditions posing

7  a substantial risk of serious harm." Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S.

8  294, 298 (1991), and citing Helling v. McKinney, 509 U.S. 25, 35 (1993)).  And second, the "prison

9  official must have a 'sufficiently culpable state of mind,' " that is, "one of 'deliberate indifference'

10  to inmate health or safety.' " Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297, 302-03).

11  The mental state of deliberate indifference is equivalent to that of reckless disregard; to be liable,

12  the prison official must know of and disregard an excessive risk to inmate health or safety. Farmer,

13  511 U.S. at 836-37. "[T]he official must both be aware of facts from which the inference could be

14  drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at

15  837.  An Eighth Amendment claimant need not show that a prison official acted or failed to act

16  believing that harm actually would befall an inmate; it is enough that the official acted or failed to

17  act despite his knowledge of a substantial risk of serious harm.  Id. at 842.

18      The "objective prong" involving a "substantial risk of serious harm" requires prisoners

19  establish they might suffer "further significant injury" or experience the "unnecessary and wanton

20  inflction of pain." Id. The "subjective prong" requires prisoners establish prison officials

21  "knowingly and unreasonably disregarded" the risk of harm. Farmer, 511 U.S. at 846. Put

22  differently, prison officials must know "about the risk to which prisoners were exposed" but then

23  "deliberately choose to maintain the harmful policies" or practices.  Disability Rights Montana,

24  Inc. v. Batista, 930 F.3d 1090, 1099 (9th Cir. 2019).

25      The question under the Eighth Amendment is whether prison officials, acting with

26  deliberate indifference, exposed a prisoner to a sufficiently "substantial risk of serious harm" to his

27  or her future health. Id. at 843 (citing Helling v. McKinney, 509 U.S. at 35.  Thus, the issue to be

28  determined, here, is whether Defendants' conduct placed Plaintiff at a substantial risk of serious

1  future harm.

2      Courts have extended the failure-to-protect line of caselaw to cases where prison officials

3  intentionally label an inmate in such a way as to subject him to violence at the hands of his fellow

4  inmates. For example, the Ninth Circuit has found an Eighth Amendment claim where an inmate

5  alleged that prison officials "labeled him a 'snitch' with the intent of having [him] killed by

6  inmates." Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).  The same holds true

7  with labeling an inmate a sex offender or "child molester." Morris v. Burrkhouse, No. CV 19-5839-

8  SVW (KK), 2021 WL 2119497, at *4 (C.D. Cal. Mar. 24, 2021) ("The allegations that Defendants,

9  for the purpose of being malicious and vindictive and identifying Plaintiff to the prison population

10  as a sex offender, falsely accused Plaintiff of a violation which they knew would result in dangerous

11  consequences are sufficient to establish Defendants acted with deliberate indifference to Plaintiff's

12  safety."); Crane v. Gonzales, No. CV F 03 6339 OWW WMW P, 2008 WL 2168927, at *3 (E.D.

13  Cal. May 23, 2008), report and recommendation adopted, 2008 WL 2676780 (E.D. Cal. June 30,

14  2008) (finding cognizable Eighth Amendment claim where prison official labeled an inmate a child

15  molester and incited inmates to harm him).

16      Here, Defendants Eslick denies making any derogatory or offensive comments to Plaintiff

17  at any time, including the phrases, "faggot," you got a small penis," "go suck," "masturbator,"

18  "watch your back," "I'll get you off of the yard," "I'm going to get you knocked out," "you will

19  see what happens," "I will send you to a level four," or "piece of shit."  (Eslick Decl. ¶ 10.)

20  Defendant Flores also denies making any offensive comments to Mr. Nuno at any time, including

21  calling him a "piece of shit," or "fucking piece of shit."  (Flores Decl. ¶ 8.)

22      Defendants Eslick and Flores also declare that based on their years of experience and

23  familiarity with prison slang and terminology in a SNY setting, none of the phrases cited to by

24  Plaintiff, including the phrase "piece of shit" are known to me to identify or suggest that an inmate

25  is a child molester.  (Eslick Decl. ¶ 11; Flores Decl. ¶ 9.)  Defendant Flores further declares that

26  "in any SNY setting, as inmates housed in Facility C include rapists, child molesters and other sex-

27  offenders, calling an inmate a child molester would not generally place that inmate in danger or

28  risk of danger for violence by other inmates in that facility. Moreover, in my time working in an

1    SNY setting, because the inmates housed at Facility C include rapists, child molesters and other

2    sex-offenders, information that an inmate had a child molestation conviction would not generally

3    place that inmate in danger or risk of danger for violence by other inmates in that facility." (Flores

4    Decl. ¶ 10.)

5         Defendants Eslick and Flores have met their initial burden of setting forth the evidence they

6    believe entitles them to judgment on Plaintiff's Eighth Amendment claim against them. The burden

7    therefore shifts to Plaintiff to demonstrate the existence of material factual disputes requiring

8    resolution by the trier of fact.  As noted above, for an Eighth Amendment claim, Plaintiff must

9    demonstrate the existence of factual disputes as to both the objective and subjective elements.

10        In opposition, Plaintiff submits that there is substantial evidence, which must be credited at

11   this stage, suggesting Defendants are lying.  (ECF No. 106 at 11.)  More specifically, Plaintiff

12   argues:

> Defendant Eslick's "piece of shit" statement was just one of many such statements she made to Plaintiff, some in the presence of other inmates (Plaintiff's dec. – paras 4, 5).  Her statements tended to focus on sex and sex offenses, including "raper," "small penis," "go suck," "mast[u]rbator" and "faggot" (id – para. 5; SUF 17, 20, 21, 23, 25, 27).  Calling Plaintiff a "raper," in particular, reveals Eslicks' contempt for sex offenses and her willingness to identify someone out loud as a sex offender.  By being on a "special needs" yard (Eslick decl. – para. 3), Eslick obviously had an awareness of the risk sex offenders face in a prison environment.  Moreover, Eslick called Plaintiff a piece of shit not once but <u>multiple</u> times (SUF 28-29; MSJ at 4:4-5).  It is inferable that at least some of those instances were in the presence of other inmates.  It is also inferable that Eslick, like Plaintiff, had heard inmates and other officers use the term as a reference to child molesters (id – para. 8).  Eslick also knew there were gang members and other non-sex offenders on the yard (Eslick dec. – para. 3).  It may be inferred from this set of circumstances that Eslick, who was in a retaliatory mood and had expressed a desire that Plaintiff be "knocked out," knew exactly the risk she was creating by using the term.
>
> Defendant Flores, too, was aware there were ex-gang members and other non-sex offenders on the yard (Flores dec. – para. 2) and yet she nevertheless called Plaintiff a piece of shit loudly enough for other inmates to hear (Plaintiff's dec. – para. 8).  She did so on the heels of Plaintiff's complaints about Eslick, giving rise to the inference she intended Plaintiff harm by using the term[.]  Flores, like Eslick, had likely heard inmates and other officers use the term "piece of shit" to refer to child molesters.  Given her posting on a sensitive needs yard (Flores dec. – para. 2, 10), Flores necessarily was aware of the risks to sex offenders in prison.  It thus may be inferred Flores knew the risk arising from her statement.

(ECF No. 106 at 11-12.) (emphasis in original).

Despite Plaintiff's own contention that Defendants Eslick and Flores knew the term "piece of shit" meant child molester, there is no other evidence to support his contention. (ECF No. 106 at 7-12.) To this end, Plaintiff requests that Court take judicial notice of several unpublished cases to stand for the supposition that the term "piece of shit" is known to refer to a child molester by inmate populations, and presumably prison staff. See, e.g., Cactus Corner, LLC v. U.S. Dep't of Agric., 346 F. Supp. 2d 1075, 1100 (E.D. Cal. 2004), aff'd, 450 F.3d 428 (9th Cir. 2006) (acknowledging that "documents are judicially noticeable only for the purpose of determining what statements have been made, not to prove the truth of the contents"; see also Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (the court can take judicial notice of unpublished court decisions, although notice is limited to the existence of the documents and not to the truth of the matters asserted therein.)

Plaintiff fails to identify a single witness who purportedly heard Defendant Flores call him a "piece of shit" or any other offensive term.[4] Indeed, at his deposition, Plaintiff could not identify any inmates who were present when Eslick made any of the alleged derogatory statements to him and admitted most of the time comments were made when he was walking alone. (Pl. Dep. 31:21-32:6, 39:2-40:5, 40:7-14, 41:8-13, 42:20-25, 44:13-19, 47:25-48:8, 48:12-17, 49:7-9, 58:22-59:3, 60:15-24, 62:12-15, 63:2-5, 64:17-23.) As to Flores, Plaintiff testified that the only negative interaction with her was sometime in October 2019, when she called him a "piece of shit," when he was sitting on his bed in his cell. (Pl. Dep. 125:22-126:4, 127:7-13.) Plaintiff fails to present sufficient evidence to demonstrate that any inmate heard Flores call him "a piece of shit," that he was attacked or threatened to be attacked as a result of any such statements, or that he was in any danger from such statement.[5] (ECF No. 106 at 7-12.)

---

[4] The Court notes that for the first time in his opposition, Plaintiff claims that Eslick called him a "raper," but this factual allegation was not raised in the first amended complaint, deposition testimony, discovery responses, or the proposed second amended complaint. (ECF No. 55 at 3-4; ECF No. 67 at 3-5.)

[5] "While a prisoner need not wait to be injured before seeking injunctive relief, see Farmer, 511 U.S. at 845[], a prisoner seeking damages must allege that the risk materialized and caused physical injury." Morris v. Burrkhouse, No. CV 19-5839-SVW (KK), 2023 WL 2717749 at 9 (C.D. Cal. February 1, 2023) (citing Rodrigues v. Norwood, No. EDCV 10-629-R (MAN), 2010 WL 2740174, at *3 (C.D. Cal. July 9, 2010) and Babcock v. White, 102 F.3d 267, 272 (7th Cir. 1996)); see also Grimes v. Pfiel, No. CV 05-2843 PA (PJW), 2011 WL 13140721, at *1 (C.D. Cal. May 31, 2011), aff'd, 502 F. App'x 701 (9th Cir. 2013) ("Where a risk has not materialized, such that a prisoner has suffered no injury from the alleged risk, a 'sufficiently serious' condition does not exist to support a claim for

With regard to Defendant Eslick, although the testimony by inmate Moreno is disputed, such dispute does not preclude judgment given Plaintiff's failure to submit sufficient evidence that Eslicks' alleged comments created an objectively serious risk of harm to his safety.  Plaintiff relies on his deposition testimony to argue that he was attacked by an unknown inmate on an unknown date, who called him a "piece of shit."  However, Plaintiff does not present specific facts that link the purported conduct of this unknown inmate who allegedly hit him on an unknown date to statements made by Eslick.  (ECF No. 106 at 7-12.)  Indeed, in response to the specific question whether he was assaulted as a result of Eslick's calling him a "Piece of shit," Plaintiff stated:

> I don't know if it could have been for that specific reason but because the inmate, I did have an incident where I was hurt, however, that inmate didn't clarify me, like you were trying to say that if it was for that comment I don't know if it was for that comment or if it was for another comment or if it was for other type of incidents or accumulation of, I don't know.

(Pl. Dep. 52:10-19.)  It is undisputed that Plaintiff was not able to identify the inmate attacker or provide a date of the alleged attack, stating only that it was "closer to summer in 2020, and the inmate "repeated similar phrases to what Officer Eslick had stated, but Plaintiff could not identify any remarks made by this unknown attacker.  (UF 8; Pl. Dep. 53:1-8, 53:21-54:6.)  Plaintiff testified that this unknown inmate "just comes up behind me or to the side of me and just gives me a punch to the side of my head and like I said it was kind of a like a warning…and he said you keep talking your mouth and that is how I connected.  He said you keep complaining or you keep talking to the officer something along those lines… you piece of shit."  (UF 11.)  Plaintiff admitted that there were officers and inmates on the yard when this assault occurred, but there were no "get down" when this attack occurred, because the officers "weren't looking."  (UF 12.)  It is undisputed that despite claiming he was punched in the head, Plaintiff did not seek medical treatment or report the incident to any medical or prison staff.  (UF 9, 13.)  Thus, Plaintiff's allegation that he purportedly attacked as a result of comments made by Defendants is entirely speculative.[6]  Furthermore,

violation of the Eighth Amendment.").  Here, Plaintiff's claim for injunctive relief in his FAC is moot since he is no longer at SCC.  See Alvarez v. Hill, 667 F.3d 1061, 1063-64 (9th Cir. 2012); Nelson v. Heiss, 271 F.3d 891, 897 (9th Cir. 2001); Dilley v. Gunn, 64 F.3d 1365, 1368 (9th Cir. 1995); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991).

[6] A district court may properly refuse to find a genuine issue of fact when the only evidence presented by the nonmoving party is her own uncorroborated and self-serving testimony. Villiarimo v. Aloha Island Air. Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also Lum v. City of Grants Pass, 2012 WL 1665871, at *1, 484 F. App'x. 89 (9th Cir. May 14, 2012); Coapland v. Long, 2012 WL 8664, at *1, 464 F. App'x. 664 (9th Cir. Jan. 3, 2012); Trujillo

1    Plaintiff's unsubstantiated testimony is discredited by the fact that there were no incident reports

2    or Rules Violation Reports documenting any assault on Plaintiff by this unknown inmate, which

3    would have been discovered by the numerous officers, and camera footage on the yard.  (UF 26-

4    31.)   Even assuming officers Eslick and Flores made derogatory comments about Plaintiff,

5    including that he is "raper," Plaintiff has not presented sufficient evidence to demonstrate that he

6    was either physically harmed or threatened with physical harm because of the comments.  See Gaut

7    v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987) ("mere threat" of possible harm does not violate the

8    Eighth Amendment).  Plaintiff's claim that an unknown inmate punched him at an unknown time

9    on the Facility C yard is so devoid of support that no reasonable jury would find that these actions

10   occurred.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Scott v. Harris, 550 U.S. 372, 380

11   (2007).  Further, Nuno presents no medical record or documentation that he was in fact harmed at

12   any time as a result of any conduct by Eslick or Flores. (ECF No. 106 at 7-122; see also AGO

13   00001-00139, Ex. B, and AGO DISC 00140-00147, Ex. C, Majd Decl.¶¶ 3-4, UF 9, 13.)

14   Because the alleged threats to Nuno's safety never materialized, Nuno cannot establish a

15   "sufficiently serious" condition existed that would support a claim for deliberate indifference.

16       Furthermore, Plaintiff admits that all times relevant to the FAC, Plaintiff was housed in an

17   SNY with other sex-offenders, including child molesters.  (UF 32, 37.)  Because inmates with sex

18   offenses, including child molesters, and other sensitive background considerations were all housed

19   on the same yard, calling an inmate a child molester would not necessarily pose a risk to an inmate

20   on that yard, and Plaintiff has not presented sufficient evidence otherwise.  (UF 40.)  Plaintiff argues

21   that non-sex offenders and "ex-gang members" were on the SNY who could have harmed him if

22   they heard he was a child molester.  However, Plaintiff fails to present sufficient evidence that he

23

24   v. Tally, 2011 WL 6122583, at *1 (9th Cir. Dec. 9, 2011).

25   Further, conclusory and/or speculative testimony in affidavits and deposition testimony that is unsupported by
     specific facts is insufficient to raise genuine issues of fact and defeat summary judgment. Thornhill Publ'g Co., Inc.

26   v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979); see also FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171
     (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is

27   insufficient to create a genuine issue of material fact."). "Conclusory allegations unsupported by factual data cannot
     defeat summary judgment." Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1078 (9th Cir. 2003); Arpin v.

28   Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (same).

1    was attacked or threatened to be attacked by such an inmate as a result of any purported statements

2    made by Eslick or Flores.  (ECF No. 106 at 7-12.)

3        Based on the foregoing, the Court finds that summary judgment should be granted in favor

4    of Defendants on Plaintiff's deliberate indifference to safety claim.

5        2.    Retaliation

6        Plaintiff contends that: (1) Eslick falsified an RVR in retaliation for Plaintiff's complaints

7    to individuals of "threats," "collusion," and "fabrication" with Defendants; (2) Flores called

8    Plaintiff "a fucking piece of shit" on October 7, 2019, to incite violence on him in retaliation for

9    filing grievances against officers Eslick and Satterfield; and (3) Satterfield conducted an unclothed

10   body search of Plaintiff on February 16, 2020, moved him to different housing and instigated

11   another prison official to place him in administrative segregation on February 13, 2021, because he

12   filed a grievance against Eslick and Flores.

13       "Prisoners have a First Amendment right to file grievances against prison officials and to

14   be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012)

15   (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  "Within the prison context, a viable

16   claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor

17   took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct,

18   and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the

19   action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d

20   559, 567-68 (9th Cir. 2005).  To state a cognizable retaliation claim, Plaintiff must establish a nexus

21   between the retaliatory act and the protected activity.  Grenning v. Klemme, 34 F.Supp.3d 1144,

22   1153 (E.D. Wash. 2014).

23       a.    Defendant Eslick

24       Plaintiff contends that Defendant Eslick made "repeated fabrications of Rules Violations

25   (even though witnesses were present) after Plaintiff made complaints, of Defendant Eslick, carrying

26   out the threats made to Plaintiff[,] including the collusion [and] fabrication done with the

27   Defendants."  (ECF No. 55 at 4.)

28   ///

1          i.    Counseling Only RVRS

2          While housed at SCC, Plaintiff received the following three counseling only RVRs from

3    officer Eslick: December 16, 2019 (RVR No. 6946745), June 7, 2020 (RVR No. 7005681) and

4    May 6, 2021 (RVR No. 7085709) for Disrespect after Nuno made disrespectful comments to

5    Officer Eslick.  (Toubeaux Decl. ¶ 5-7, 9, Exs. A, B. C.)

6          With regard to the counseling only RVRs (Nos. 6946745, 7005681 and 7085709), Plaintiff

7    has not shown an adverse action is action that "would chill a person of ordinary firmness" from

8    engaging in that activity.  Pinard v. Clatskanie Sch. Dist., 467 F.3d 755, 770 (9th Cir. 2006).

9    Though an adverse action need not be an independent constitutional violation, inconsequential or

10   de minimis harms do not constitute adverse actions.  Watison, 668 F.3d at 1114 (noting that to

11   support a claim, a harm must be "more than minimal").  Plaintiff must establish that that a person

12   of ordinary firmness would have been chilled from exercising their First Amendment rights, and

13   the threatened harm must be more than minimal. Rhodes, 408 F.3d at 568 n. 11.

14         A "counseling only" chrono is issued when "minor misconduct recurs after verbal

15   counseling or if documentation of minor misconduct is needed." Cal. Code Regs. tit. 15, §

16   3312(a)(2).[7] The regulations do not require that any action be taken as a result of a counseling or

17   informational chrono. See Cal. Code Regs. tit. 15, §§ 3000, 3312. Whether issuing a counseling

18   chrono is an "adverse action" is not a settled proposition. Compare Spence v. Kaur, No. 2:16-cv-

19   1828 TLN KJN P, 2022 WL 2705216, at *12-13 (E.D. Cal. July 12, 2022) (counseling chrono not

20   adverse action for purposes of retaliation); Wimberly v. Martin, No. CV 21-5494 SVW (MRW),

21   2022 WL 17219090, at *2 (C.D. Cal. Aug. 3, 2022) (same); Alem v. Burton, 2021 WL 2805775,

22   at *4 (E.D. Cal. July 2, 2021) ("counseling chronos are not adverse actions"; citing Vallery v.

23   Botkin, 2020 WL 7425343, at *4-5 (E.D. Cal. Dec. 18, 2020) (collecting other district court cases

24   concluding that counseling chronos do not constitute adverse actions), report and recommendation

25   adopted, 2021 WL 843614 (E.D. Cal. Mar. 5, 2021)) with Brown v. Chothia, 2021 WL 2913076,

26
27   [7] The court notes that the California Department of Corrections and Rehabilitation amended the regulation governing documentation of minor misconduct, California Code of Regulations, Title 15, § 3312, in 2016.  Prior to the amendment, minor misconduct was documented on a custodial counseling chrono, referred to as a 128-B. Vallery, 2020 WL 7425343 at *3, 4.  After the amendment § 3312 subsection (a)(2) required that minor misconduct be "documented on a Counseling Only Rules Violation Report." Id. at *3.

28

at *13 (E.D. Cal. July 12, 2021) (reasonable jury could find that counseling chrono "intimated some form of punishment or negative effect would follow if plaintiff did not correct the underlying 'misconduct' " for an adverse action; quoting Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) ("[T]he mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect.") (emphasis original)), report and recommendation adopted, 2021 WL 4132341 (E.D. Cal., Sep. 10, 2021).

Nonetheless, in this case, Plaintiff has not alleged how placing the counseling chrono RVRs adversely affected him. In his opposition, Plaintiff argues that the counseling chronos "are placed in Plaintiff's central file and could potentially influence the decisions or conduct of other officers who read his file" and that "it could lead to adverse interactions with other officers," and that he "was aware of these chilling possibilities." (ECF No. 106 at 16.) However, Plaintiff's incarceration has not been extended and he has failed to show any direct causal relationship between the issuance of the RVR and any possible loss of privileges. (Toubeaux Decl. ¶ 8; Eslick Decl. ¶ 20.) Plaintiff's housing has not been affected nor has he been subjected to any criminal prosecution as a result of the RVR. (Id.) Theses incidents, at most, involved a minimal amount of harm which is insufficient to chill a person of ordinary firmness from exercising their First Amendment rights. Rhodes, 408 F.3d at 568 n. 11; Arrant v. Zambrano, No. 3:20-cv-01220 JLS-AGS, 2020 WL 5408211, at *4 (S.D. Cal. Sept. 9, 2020 (finding dismissal of alleged false RVR as counseling only was non-minimal harm). On this record, Plaintiff has not stated a plausible retaliation claim against Defendant Eslick based on the filing of the counseling chrono RVRs.

### ii.    February 10, 2020 RVR No. 6966726

Officer Eslick issued only one RVR for serious disciplinary action against Plaintiff on February 10, 2020, RVR No. 6966726 for unlawful influence. (Eslick Decl. ¶ 22; Toubeaux Decl. ¶ 9, Ex. D.) The nature of the circumstances of the violation in RVR No. 6966726 states as follows:

> On Monday, February 10, 2020, at approximately 1715 hours while performing my duties as Facility C Yard #1 Officer and observing building one inmates entering and exiting Chow Hall #6, I was approached by Inmate Nuno CDCR # AW9284, C1-118. Inmate Nuno stated, "I just want to know what I have to do to make you understand that I am a nice guy and I don't deserve that" (referring to a Counseling Only RVR for Disrespect without Potential

24

for Violence/Disruption written on 12/16/2019).  I replied, "You were verbally counseled three times without correcting your behavior, and I informed you of the Counseling Only RVR."  Inmate Nuno then stated, "So are you going to pull it?  I could have put paper work on guys but I didn't and I don't mean just a 602 either."  (This is the second time that inmate Nuno has stated this.  On Thursday, February 6, 2020 inmate Nuno stated, "I think you should get rid of your paper work on me or I will be putting paper on you and I don't mean in here.  I could have put a 602 on David at my cell but I didn't, so maybe you should be nice to me like I am being nice to you."  I informed inmate Nuno that first names are not appropriate and that regardless of repercussions from him the Counseling Only RVR is not going to be removed.)  I replied, "You were talked to about your behavior and did not correct it, I will not be pulling the Counseling Only RVR."  Inmate Nuno stated, "I don't know what I have to do, you don't understand, I said I was sorry, you know you are really messing up a lot of things for me so what do I need to do to convince you, you know you are wrong and I can still file paper work on you if you don't."  I asked inmate Nuno if he was threatening me and he responded "you never told me why you keep writing me up you never told me."  I replied, "I have explained every time you have had a disrespectful incident what the disrespect was and how to correct it and you have neglected to do so and continued your behavior.  I have only written you up once for a Counseling Chrono RVR so I am not sure why you're saying I keep writing you up?"  Inmate Nuno replied, "So you're going to pull it and we are good right?"  I replied, "I am not removing your RVR no matter what action is taken, I have not done anything wrong."  I informed inmate Nuno that he would be receiving a RVR and a mental health MH5 referral so that they can help him understand that this attempt of influence is unlawful.  I stated, "I am finished talking with you and you need go [sic] eat dinner."  Inmate Nuno complied.

(Toubeaux Decl. Ex. D.)

A disciplinary hearing was held on this RVR by a senior hearing officer, who found Plaintiff guilty of the charge and assessed 30-days of good-time credit, among other privileges.  (Toubeaux Decl. Ex. E.)

At his deposition, Plaintiff testified that he informed Eslick's supervisor, sergeant Tague that Eslick was discriminating against him for a job opening.  (UF 42.)  Plaintiff testified that officer Eslick played a role in his ability to get this job opening because unknown "officers and clerks" told Plaintiff that Officer Eslick had influence over job assignments as she had a "personal relationship with the Supervisor…at Sierra Conservation."  (UF 43.)  Plaintiff further testified that he never filed a grievance concerning officer Eslick's alleged discrimination and failure to assign him to the desired job placement, instead he made a verbal complaint to Officer Eslick's supervisor, sgt. Tague.  (UF 44.)  Sgt. Tague was Officer Eslick's immediate supervisor, when she worked as a Correctional officer in Facility C, at all relevant times to the FAC.  (UF 45.)  Sgt. Tague recalls

1    Plaintiff made multiple and frequent complaints about multiple officers on Facility C, however,

2    due to the passage of time, Tague does not recall any specific complaints Plaintiff made against

3    officer Eslick.  (UF 46.)

4         Officer Eslick declares that she does not recall sergeant Tague informing her about any

5    verbal complaints Plaintiff made against her, but even if Plaintiff made such complaints to Tague,

6    inmate complaints against correctional officers are a normal part of the job and would not have

7    influenced her treatment of Plaintiff, or the performance of her duties as a correctional officer.

8    (Eslick Decl. ¶ 9.)

9         Defendant argues at the time the RVR was issued, she was not aware of any verbal or written

10   complaints Plaintiff made against her, the RVR did not have a chilling effect on Plaintiff's protected

11   conduct, and the RVR is <u>Heck</u>-barred.

12        **(1)    Retaliatory Motive/Legitimate Penological Interest**

13        Plaintiff must show that his constitutionally protected conduct was a " 'substantial' or

14   'motivating' factor" for the alleged retaliatory action. <u>Brodheim</u>, 584 F.3d at 1271 (quoting

15   <u>Soranno's Gasco, Inc. v. Morgan</u>, 874 F.2d 1310, 1314 (9th Cir. 1989)). "[P]laintiff must show that

16   the defendant's retaliatory animus was 'a "but-for" cause, meaning that the adverse action against

17   the plaintiff would not have been taken absent the retaliatory motive.' " <u>Capp v. Cnty. of San Diego</u>,

18   940 F.3d 1046, 1053 (9th Cir. 2019) (as amended) (citation omitted).

19        Plaintiff argues that Eslick's "words" establish her retaliatory intent." (ECF No. 106 at 14.)

20   "Relative to Eslick's falsified rules violation reports, Eslick told Plaintiff that, if he wanted to

21   complain, Defendant would 'get [his] points up and send [him] to a level four [prison]' (id – para.

22   6).  Notably, under CDCR regulations, RVRS can result in a prisoner's 'points' going up." (<u>Id.</u> at

23   14-15; <u>see also</u> Pl. Decl. ¶ 6.)

24        Defendant argues that, while timing can be considered circumstantial evidence of

25   retaliatory intent, Plaintiff cannot show that the issuance of the RVR on February 10, 2020, was in

26   response to his complaints about her which took place occurred five-to-six months prior thereto.

27   In this instance, the Court does not find that five-to-six months is so attenuated as to foreclose an

28   inference that the chronology of events supports a retaliatory motive.  <u>See</u> <u>Allen v. Iranon</u>, 283 F.3d

1070, 1077–78 (9th Cir. 2002) (finding an eleven-month gap was circumstantial evidence of retaliatory motive) (citing Schwartzman v. Valenzuela, 846 F.2d 1209, 1212 (9th Cir. 1988). Eslick's awareness of Plaintiff's grievances and complaints is not sufficient, on its own, to demonstrate a retaliatory motive. However, if Plaintiff were able to prove his allegations concerning Eslick's statements, a reasonable jury could credit Plaintiff's allegation that Eslick issued the RVR to retaliate against Plaintiff. In addition, viewing Plaintiff's allegations in the light most favorable to him, there is a dispute of fact as to whether the issuance of a false RVR served a legitimate penological interest, such as the preservation of institutional order, discipline, and security. Barnett v. Centoni, 31 F.3d 813, 316 (9th Cir. 1994). Therefore, given the nature of Defendant's alleged statements and the temporal proximity of the issuance of the alleged false RVR, Plaintiff has sufficiently raised a genuine issue of material fact whether Plaintiff's protected conduct was a substantial or motivating factor for Defendant's alleged retaliatory actions and whether it served a legitimate penological interest.

### (2)    Chilling Effect

The Ninth Circuit has expressly rejected the idea that a prisoner must "demonstrate a total chilling of his First Amendment rights to file grievances...in order to perfect a retaliation claim. Speech can be chilled even when not completely silenced." Rhodes, 408 F.3d at 568; see also Cohen v. Summervold, 276 F. App'x 642, 643 (9th Cir. 2008) ("The fact that Cohen continued to file grievances and federal actions despite the alleged retaliation cannot be used to determine that he failed to state a claim that his First Amendment rights were chilled...."). Instead, the Ninth Circuit directs courts to ask whether the alleged retaliatory acts "would chill or silence a person of ordinary firmness from future First Amendment activities." Rhodes, 408 F.3d at 568–69 (citation omitted).

Here, there is no question that issuance of a false RVR based on the exercise of right to file complaints and/or grievances, would chill a person of ordinary firmness. Thus, the fact that Plaintiff filed two or more grievances against Eslick after issuance of the RVR is not dispositive. Indeed, Plaintiff submits "that he declined to submit appeals for some of Eslick's conduct, including her threats and abusive language, due to Eslick's retaliatory actions." (ECF No. 106 at

16; Pl. Decl. ¶ 18.)  The fact that Plaintiff was ultimately not deterred from pursuing a grievance does not entitle Defendant to summary judgment.

**(3)    Heck-Bar**

Defendant argues that this claim is barred by the favorable termination rule, also known as the Heck bar.

A state prisoner cannot challenge the fact or duration of his/her confinement in a Section 1983 action; his/her sole remedy lies in habeas corpus relief. Wilkinson v. Dotson, 544 U.S. 74, 78 (2005). Often referred to as the favorable termination rule or the Heck bar, this exception to § 1983's otherwise broad scope applies whenever state prisoners "seek to invalidate the duration of their confinement-either directly through an injunction compelling speedier release or indirectly through a judicial determination that necessarily implies the unlawfulness of the State's custody." Wilkinson, 544 U.S. at 81; Heck v. Humphrey, 512 U.S. 477, 486–87 (1994); Edwards v. Balisok, 520 U.S. 641, 644 (1997).  Thus, "a state prisoner's [Section] 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." Wilkinson, 544 U.S. at 81–82.  The defendant has the burden of demonstrating that Heck bars a plaintiff's section 1983 claim. See Sandford v. Motts, 258 F.3d 1117, 1119 (9th Cir. 2001). (9th Cir. 1996)).

The Heck bar applies to claims of First Amendment retaliation. See Moschref v. Stratton, 697 F. App'x 532, 533 (9th Cir. 2017) (retaliation claim against officer for making false statements was Heck-barred when plaintiff's DUI conviction was based on content of statements); Burgess v. Raya, 690 F. App'x 483, 484 (9th Cir. 2017) (retaliation claim against correctional officers was Heck-barred when success would invalidate result of disciplinary proceeding); Smith v. Ball, 278 F. App'x 739, 741 (9th Cir. 2008) (retaliation claim was Heck-barred "because prevailing on [plaintiff's] claim would imply the invalidity of her criminal convictions arising from the same events").

Here, Plaintiff correctly argues that Defendant has failed to present evidence that his "multiple sentences" will be affected by the credit loss.  (ECF No. 106 at 19.)  Defendant has not

28

presented any evidence or argument indicating that the 30-day loss of credits will affect the overall length of Plaintiff's confinement.  See Sanford v. Motts, 258 F.3d 1117, 1119 (9th Cir. 2001) (noting that it was the defendant's burden to establish the Heck defense).  Indeed, Defendant does not address Plaintiff's specific argument in the reply.  (See ECF No. 109 at 4-6.)  This is particularly so, given that prisoner can bring section 1983 actions when their lawsuits do not, in effect, collaterally attack the duration of their confinement nor a conviction—for instance, when a prisoner is serving a life term.  See Vandervall v. Feltner, 2010 WL 2843425, at *6 (E.D. Cal., July 19, 2010) (if a plaintiff is serving a definite sentence, a loss of good-time credits sanction will lengthen the prisoner's sentence in accordance with the sanction; however, this is not the case where a plaintiff is serving an indeterminate sentence.)  In addition, if success in a 1983 lawsuit does not cause an immediate release or a shorter stay in prison, the Heck bar does not apply.  Id. at *5 (the Heck bar "turns solely on whether a successful § 1983 action would necessarily render invalid a conviction, sentence, or administrative sanction that affected the length of the prisoner's confinement.") (quoting Ramirez, 334 F.3d at 856) (citing Jenkins v. Haubert, 179 F.3d 19, 27 (2d Cir. 1999)) ("[A] § 1983 suit by a prisoner ... challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by Heck.").  Accordingly, Defendant is not entitled to summary judgment based on the argument this claim is Heck-barred.

### b.    Defendant Flores

Plaintiff alleges that officer Flores became aware that he had "initiated the process to exhaust administrative remedies involving Defendants Eslick and Satterfield, and she began to purposely subject him to "extreme harassment techniques."  (ECF No. 55 at 7.)

Defendant argues that "[t]he only specific allegation of "harassment" by Plaintiff is that on October 7, 2019, Officer Flores called Nuno a 'fucking piece of shit' while Nuno was walking by intending for inmates to hear, placing Nuno at risk of attack by other inmates."  (ECF 82 at 29.)  Defendant further argues because Plaintiff "did not submit his grievances against Officers Eslick and Satterfield until February 20, 2020, assuming Officer Flores made such a comment to Nuno (which she did not) four months prior in October 2019, Nuno cannot claim that Officer

Flores's purportedly derogatory statement was in response to, or in retaliation of, Nuno's protected conduct. (SUF 50, 152, 157, 159.) Nuno cannot establish a causal connection between Officer Flores's alleged verbal harassment and any retaliatory conduct by her." (Id.)

In the operative first amended complaint, Plaintiff alleges as follows:

> Defendant Flores became aware that Plaintiff had initiated the process necessary to exhaust administrative remedies involving other defendants Eslick and Satterfield. Plaintiff had to legally first pursue the CDCR 22 request form(s) procedure. Plaintiff had to write complaints about Eslick and Satterfield's misdeeds inflicted upon Plaintiff. Defendant Flores became aware of these complaints written against her fellow officers, and began to purposely subject Plaintiff to extreme harassment techniques. On October 07, 2019, as Plaintiff was walking past Defendant Flores, she loudly exclaims so as other inmates could hear: "You're a fucking piece of shit!!" Defendant yelled-out this verbiage knowing that inmates overhearing such would accept it as a true account that Plaintiff is an offender of sexual molestation against minors—thus placing Plaintiff at risk of assault or being killed by inmates. Defendant Flores then informed Defendant Satterfield about her provocation of Plaintiff. Satterfield (again) had threatened Plaintiff that: "you better not 602 (file grievance) her (Flores)."

(ECF 55 at 7.)

In opposition, Plaintiff argues that he "complained directly to Flores about Eslick in the hopes that Flores could intervene on his behalf. He also told Flores that he was documenting Eslick's misconduct." (ECF No. 106 at 20.) Shortly thereafter, "Flores apparently enlisted Defendant Satterfield to threaten Plaintiff not to complain about Flores' own abusive statement" and a jury "could infer that Flores enlisted Satterfield also to confiscate Plaintiff's documentation of Eslick's misconduct." (Id.; Pl. Decl. ¶ 9.) Plaintiff also submits that Flores "aided and facilitated by Defendant Satterfield of threatening Plaintiff not to file an administrative appeal and searching Plaintiff's cell, destroying his property and confiscating his documentation" and submitted falsified RVRs. (ECF 106 at 20-23; see also Pl. Decl. ¶¶ 8, 9, 23.)

It is undisputed that Plaintiff testified that sometime in October 2019, Officer Flores walked by Plaintiff's cell while he was sitting on his bed and called him "a piece of shit out loud." (UF 21.) On February 20, 2020, Plaintiff submitted Appeal No. SCC-X-20-01031, against Officer Flores, claiming Officer Flores changed the truth in what was reported in her RVR that she issued to Plaintiff, further claiming this RVR was issued in retaliation for complaints he previously

1   filed; in his appeal, Plaintiff also claimed the Senior Hearing Officer who reviewed the RVR twisted

2   his words and made up his mind prior to the RVR hearing.  (UF 66.)  On this same date, Plaintiff

3   also submitted Appeal No. SCC-X-20-00786, claiming Facility C Officers Flores, Eslick, Rivera,

4   and Satterfield retaliated against Plaintiff, conspired to write RVRs against him, colluded, were

5   abusive, conducted themselves unethically, and conspired to have him "kicked off the yard";

6   Plaintiff alleged the actions of the officers caused Plaintiff brain damage and as a result required

7   him to take prescribed medication.  (UF 68.)

8         Defendant argues that: (1) Plaintiff cannot raise claims not presented in his first amended

9   complaint; and (2) Plaintiff's retaliation claim raised in the first amended complaint fails because

10  he has not established a causal connection between the verbal harassment and retaliatory action,

11  and there was no chilling effect on his First Amendment rights.

12        In the proposed second amended complaint, Plaintiff alleged:

13
14      Defendant Flores became aware that Plaintiff had initiated the process necessary to exhaust
    administrative remedies involving other defendants Eslick and Satterfield.  Plaintiff had to
15  legally first pursue the CDCR request form(s) procedure.  Plaintiff had to write complaints
    about Eslick and Satterfield's misdeeds inflicted upon Plaintiff.  Defendant Flores became
16  aware of these complaints written against her fellow officers, and began to purposely subject
    Plaintiff to extreme harassment techniques.  On October 7, 2019, as Plaintiff was walking
17  past Defendant Flores, she loudly exclaims so as other inmates could hear: "You're a
    fucking piece of shit!!"  Defendant yelled-out this verbiage knowing that inmates
18  overhearing such would accept it as a true account that Plaintiff is an offender of sexual
    molestation against minors—thus placing Plaintiff at risk of assault or being killed by
19  inmates.  Defendant Flores then informed Defendant Satterfield about her provocation of
    Plaintiff.  Satterfield (again) had threatened Plaintiff that: "you better not 602 (file
20  grievance) her" (Flores).

21      After complaining to Defendant Flores of Defendant Eslick['s] misconduct Flores does
22  what is described.  Then on 12-17-2019 Flores again calls Defendant Satterfield (who is not
    assigned to building, Flores and Rivera are just as 10-7-2019) and has my property with
23  documents of violations destroyed being that I notified Flores of documents.  This is
    described in grievances along with fabrication of RVR in collusion with Defendant on 2-
24  10-2019 & does not issue Plaintiff[']s mail/materials on 4-30-20.

25  (ECF No. 67 at 9-10.)

26        Here, it is clear that from the proposed second amended complaint that Plaintiff raised the

27  allegations that: (1) he complained to Flores about documenting Eslick's behavior; (2) Flores

28

1    enlisted Satterfield to threaten Plaintiff not to complaint about Flores's abusive statement; (3)

2    Flores enlisted Satterfield to confiscate his documentation of Eslick's misconduct; (4) Flores

3    assisted Satterfield by threating Plaintiff not to file a grievance and searching his cell, destroying

4    property and confiscating documentation; and (5) Flores submitted false RVRs.  (ECF No. 67 at 9-

5    10; ECF No. 106 at 20-23.)   Plaintiff's proposed second amended complaint was deemed

6    unnecessary given that the Court denied Defendants' motion to dismiss Plaintiff's first amended

7    complaint for failure to state a cognizable claim for relief.  (See ECF Nos. 70, 71.)  While these

8    allegations were not in Plaintiff's first amended complaint, Plaintiff proffered the allegations in the

9    proposed second amended complaint (filed prior to conducting discovery) as well as in his

10   opposition, the Court finds that Defendants have had fair notice such factual allegations such as to

11   be consumed within his retaliation claim against Defendant Flores.  Thus, the Court finds that these

12   new factual allegations fall within the first amended complaint under Rule 8's liberal notice

13   pleading standard.  See Chodos v. W. Publ'g, 292 F.3d 992, 1003 (9th Cir. 2002) (the decision

14   whether to permit such a belated attempt to expand a complaint lies within the discretion of the

15   district court).

16        There are disputed facts about whether the conduct occurred and whether it was done in

17   retaliation.  Based on Plaintiff's declaration, which must be accepted as true and construe in the

18   light most favorable to Plaintiff when ruling on Defendants' motion for summary judgment, there

19   is evidence in the record from which a fair-minded jury could reasonably find that Defendant

20   Flores took an adverse action against Plaintiff (calling him a "piece of shit," enlisted Satterfield to

21   confiscate Plaintiff's documentation of Eslick's misconduct," assisted Satterfield in searching his

22   cell and destroying his property, and issued a false RVR) because he engaged in protected

23   conduct (making oral complaints and initiating the process to complain by way of use of the

24   administrative grievance process).  As Plaintiff states in his first amended complaint and

25   opposition, Plaintiff alleges that Flores became aware he initiated the process necessary to

26   exhaust the administrative remedies, including form 22 complaints and "preparatory grievances"

27   found and confiscated by Satterfield.  (ECF No. 55 at 7; ECF No. 106 at 25.)  While the evidence

28   may not be conclusive of retaliatory motive, viewing the facts in the light most favorable to

Plaintiff, the timing of events combined with the statements allegedly made by Defendant Flores are sufficient to raise a triable issue of fact regarding Defendant Flores's motives. See Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir.2003) (statements and suspect timing raised triable issue of fact regarding whether the defendants' motive behind plaintiff's gang validation was retaliatory). Further, as Plaintiff alleges the RVR was false, the filing of false charges against a prisoner could reasonably "chill or silence a person of ordinary firmness from future First Amendment activities." Rhodes, 408 F.3d at 568.  Furthermore, Defendant has proffered no evidence demonstrating that Plaintiff has made inconsistent statements such that his allegations must be excluded. See Messick v. Horizon Indus. Inc., 62 F.3d 1227, 1231 (9th Cir. 1995) ("While ... a party may not 'create his own issue of fact by an affidavit contradicting his prior deposition testimony,' the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony ...; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." (internal citation omitted)).  Defendant is free to raise any inconsistencies in Plaintiff's opposition and deposition testimony at trial in an attempt to impugn his credibility, but these types of credibility questions are for the jury to decide, not the court on a motion for summary judgement.

### c.    Defendant Satterfield

In his first amended complaint, Plaintiff alleges that when Satterfield became "aware that [Plaintiff] had initiated the process to exhaust administrative remedies involving [] Defendants Eslick and Flores," Satterfield retaliated against him by: (1) conducting an unclothed body search on him on February 16, 2020; (2) moving him to different housing; and (3) instigating Lt. Bullock to place Plaintiff in ASU housing on February 13, 2021. (ECF No. 55 at 5-6.)

Defendant initially argues that Plaintiff abandoned his claims that Satterfield moved him to a different housing unit and instigated for him to be placed in ASU housing because these claims were not addressed in Plaintiff's opposition.  The Court agrees.  Plaintiff did not address either of these claims in his opposition or surreply.  Accordingly, these claims are deemed abandoned.  See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008) (It is well-established that

"a plaintiff has 'abandoned ... claims by not raising them in opposition to [the defendant's] motion for summary judgment.' ") (quoting <u>Jenkins v. Cty. of Riverside</u>, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)); <u>see also</u> <u>Bernstein v. Virgin Am., Inc.</u>, 365 F.Supp.3d 980, 985 (N.D. Cal. 2019), amended in part, No. 15-CV-02277-JST, 2022 WL 17994018 (N.D. Cal. Dec. 29, 2022) ("Where a party 'has a full and fair opportunity to ventilate its views with respect to an issue' at summary judgment, yet does not raise it, the Ninth Circuit deems the argument abandoned on appeal." (quoting <u>BankAmerica Pension Plan v. McMath</u>, 206 F.3d 821, 826 (9th Cir. 2000))).

As previously stated, Plaintiff claims that on February 16, 2020, Satterfield conducted an unclothed body search of Plaintiff without cause, and in retaliation of Plaintiff's grievance against Eslick and Flores.  (ECF No. 55 at 5.)

In the first amended complaint, Plaintiff alleged:

Defendant Satterfield became aware that Plaintiff had initiated the process necessary to exhaust administrative remedies involving other Defendants Flores and Eslick.  Plaintiff had to legally first pursue the CDCR 22 request form(s) procedure.  Plaintiff had to write complaints upon Eslick's misdeeds and obtain replies from Eslick's supervisors.  Defendant Satterfield became aware of these complaints submitted by Plaintiff and went ahead and began to purposely subject Plaintiff to extreme harassment tactics.  On February 16, 2020, while Plaintiff was attending religious services, Satterfield had stalked and located Plaintiff, walked Plaintiff into a holding cell area of the prison away from view of everyone, and forced Plaintiff to remove all of his clothing for a so-called strip search in which no cause existed for.   Satterfield told Plaintiff: "you're going to the hole!"—inferring that Plaintiff would be moved to administrative segregation (ad-seg).  Satterfield began remarking to Plaintiff that "you keep writing up 602'2 (inmate appeals) on Eslick and other officers here).  Plaintiff became very nervous and had feared this rogue officer Satterfield.  Satterfield then had Plaintiff moved from his housing unit into another to create further turmoil for Plaintiff.  Satterfield then also instigated his superior Lieutenant Bullock to actually place Plaintiff into ad-seg on February 13, 2021.  (EXHIBIT A).  Then, afterwards, the same officer, Sergeant Sesma, determined that Plaintiff was actually wrongly placed in ad-seg (EXHIBIT B).  Plaintiff did have "concerns", however, such concerns were about the correctional staff harassing Plaintiff—which became purposely misconstrued through the efforts of Defendant Satterfield.  By and through this verified complaint Plaintiff can testify that Satterfield was manipulating other staff into creating a scenario to harass Plaintiff by having Plaintiff moved into the ad-seg unit commonly called the "hole."   Satterfield took unconstitutional action against Plaintiff as retaliation for Plaintiff's earlier written grievances upon Eslick and Defendant Flores.  Although Plaintiff was eventually release from the "hole", Satterfield's unrelenting harassment continues.

Throughout all of the remainder of February 2021 and March 2021 up to the date of this suit, Satterfield continues to keep stalking Plaintiff, seeing Plaintiff on the grounds of the

1
2
3
4

yard of the prison and telling Plaintiff: "you keep it up (filing the 602's-complaints) and you will next be in a plastic bag!"  The dates are continuous and ongoing.  Plaintiff fears that Satterfield will carry out on his repeated threats as Satterfield has against several other inmates at the prison before.  His superior officers allow Satterfield to get away with very serious acts against inmates—from PREA abuses to severe beatings.

(ECF No. 55 at 5-6.)

5
6
7
8

Defendant argues this claim is temporally impossible because Plaintiff did not submit his first grievance against Eslick and Flores until February 20, 2020, the search served a legitimate penological purpose to prevent the introduction of contraband into the prison, and the search did not chill Plaintiff's First Amendment rights.

9
10
11
12
13
14
15

In opposition, Plaintiff submits that he made oral complaints about Eslick to Flores, conformed copies of form 22 complaints against Eslick and prepared administrative appeal forms which were both confiscated by Satterfield during the cell search.  After Plaintiff verbally complained to Flores, Satterfield threatened Plaintiff not to file an appeal against Flores.  (ECF No. 106 at 27.)  Then, in December 2019, a few days after Plaintiff again complained to Flores about Eslick, Satterfield searched Plaintiff's cell and confiscated documentation of Eslick and Flores's misconduct.

16
17
18

Defendant argues that Plaintiff did not plead any retaliation claim for falsified RVRs or a cell search in his first amended complaint, and Plaintiff provides no evidence to support his claim that the search was done in retaliation.

19
20

In the proposed second amended complaint, Plaintiff alleged, in pertinent part:

21
22
23
24
25
26
27
28

On 10-7-2019 Defendant Satterfield (DS) began excessively repeated misconduct with threats that were carried out with "do not grievance Flores or else."  Other threats continued "we'll get your points up and second you to a 4 yard w[h]ere you'll get hit," "you keep complaining of Eslick."  On 12-17-2019 Defendant Flores calls DS over to building and DS destroys Plaintiff's property and documents regarding Defendants, in front of many witnesses, on dayroom floor.  Then threatens Plaintiff when Plaintiff attempts to recover documents.  On 2-10-20 DS fabricates 2 reports in collusion with Defendants carrying out threats said to Plaintiff.  On 2-16-20 DS fabricates a Rules Violation Report after violating Plaintiff after leaving church.  In that report DS is caught in lies by stating I delayed yard but it was found not true, never gave an order but lied.  He again fabricates another RVR on 3-22-20 in which Lt. Sebold (not usually at facility) does honor questioning (unlike the others) and dismisses the RVR-fabricated.  Satterfield never got to coach him unlike others.  Exhibit C.  It is learned (DS) has personal relationship with Def. Flores, influence.  Even after grievances & complaint (DS) goes into [inmate] Becker cell & takes Plaintiff's

legalwork not once but twice, was returned missing many pages, even though it is legal to rec[ei]ve help, by Bullock.

(ECF No. 67 at 8.)

It is clear that from the proposed second amended complaint that Plaintiff raised the additional allegations that Defendant Satterfield: (1) issued two false RVRs; (2) searched Plaintiff's cell; and (3) made verbal threats against complaining or using the administrative grievance process.[8]   Accordingly, for the same reasons explained above as to Defendant Flores, these new factual allegations fall within the first amended complaint under Rule 8's liberal notice pleading standard.  See Chodos v. W. Publ'g, 292 F.3d at 1003 (9th Cir. 2002).

Based on the disputed accounts provided in the declarations of Plaintiff and Satterfield as to what conduct occurred and whether it was done out of retaliation preclude summary judgment on this claim.  Plaintiff declares that prior to the adverse actions (unclothed body search, issuance of two false RVRs, cell search, and threats against filing complaints), Satterfield was aware that Plaintiff: (1) made verbal complaints about Eslick and Flores; (2) submitted a Form 22 Request for Interview; and (3) was preparing administrative appeals against officers which were confiscated by Satterfield in a December 17, 2019, cell search.  Defendant Satterfield denies knowledge of any complaints by Plaintiff prior to the February 16, 2020 unclothed search, denies making any threats or statements to him about filing complaints, and claims the actions taken served a legitimate penological purpose.

Here, Plaintiff has alleged a chronology of events from which a factfinder could infer retaliatory intent: that he expressed complaints about officers, submitted a request for interview, and was preparing administrative appeals, and was thereafter subjected to an improper unclothed body search, issued two false RVRs, subjected to cell search in which property was improperly confiscated, and subjected to verbal threats relating to filing complaints.  The fact that one of the RVRs was reduced to a counseling chrono and the other was dismissed, does not change the fact that both RVRs were filed (allegedly in retaliation) as a serious rules violation in which Plaintiff

---

[8]   The mere threat of harm can be a sufficiently adverse action to support a retaliation claim. Shepard v. Quillen, 840 F.3d 686, 688-89 (9th Cir. 2016); Brodheim v. Cry, 584 F.3d at 1270.

could have been subjected to discipline. As stated above, an RVR differs from a counseling only RVR because a counseling only requires no action to be taken. By contrast, an RVR results in disciplinary proceedings being instituted against the inmate, as was done in this case. See Cal. Code Regs. tit. 15, § 3312(a)(3) (setting forth procedure for instituting disciplinary proceedings via RVR). Because Plaintiff alleges that he was issued a RVR (as opposed to a Counseling Only RVR) as retaliation for the exercise of his First Amendment rights, he has sufficiently pled an adverse action. The adverse action is not belied simply because a third party reduced or dismissed the RVR as it is the Defendant's actions and the chilling effect thereof that are at issue in this action. See See Hines v. Gomez, 108 F.3d 265, 268-69 (9th Cir. 1997) (finding that it was the "retaliatory accusation[ ]" and not the actual result (i.e. "the additional confinement or the deprivation of the television") that constituted an injury and upholding jury determination of retaliation based on filing of a false rules violation report); Menefield v. Anderson, No. 21-04910, 2023 WL 1453165, at *11 (C.D. Cal. Jan. 9, 2023), report and recommendation adopted, 2023 WL 1448020 (C.D. Cal. Feb. 1, 2023) (finding allegations that defendants filed RVRs against plaintiff sufficient to satisfy adverse action element); Vallery v. Botkin, No. 2:20-CV-0767-TLN-KJN, 2020 WL 7425343, at *4 (E.D. Cal. Dec. 18, 2020), report and recommendation adopted, 2021 WL 843614 (E.D. Cal. Mar. 5, 2021) ("California courts have consistently found that an allegedly false Rules Violation Report, issued pursuant to § 3312(a)(3), can rise to the level of an adverse action for a retaliation claim."); Brodheim v. Cry, 584 F.3d at 1270 ("mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect."). Viewing the evidence in the light most favorable to plaintiff, the Court finds that there are genuine issues of material fact regarding whether Defendant Satterfield retaliated against Plaintiff.

      3.    Punitive Damages

To recover punitive damages against an individual officer in a case brought under 42 U.S.C. § 1983, a plaintiff must show the officer's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). "The standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases," which extends to "malicious, wanton,

1    or oppressive acts or omissions." Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005).

2          Defendants argue it is undisputed that they did not act with the requisite mental state and

3    "[b]eyond his own conclusory, speculative declaration, [Plaintiff] has not produced any evidence

4    to demonstrate that Defendants acted with the requisite evil motive or intent or reckless and callous

5    indifference to [Plaintiff's] federally protected rights." (ECF 109 at 10.) Defendants' argument

6    assumes the validity of their version of the relevant facts. However, viewing the record in the light

7    most favorable to Plaintiff, a triable issue of fact remains as to whether Defendants exhibited

8    reckless and callous indifference to Plaintiff's rights under the First Amendment. Accordingly, the

9    Court does not conclude as a matter of law that Defendants acted without the mental state that could

10   support an award of punitive damages. Accordingly, Defendants have not met their burden for

11   summary adjudication on the matter of punitive damages.

12          4.     Qualified Immunity[9]

13          The defense of qualified immunity protects "government officials ... from liability for civil

14   damages insofar as their conduct does not violate clearly established statutory or constitutional

15   rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818

16   (1982); see also Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). Qualified immunity considers (1)

17   whether a violation occurred and (2) whether the right was "clearly established in light of the

18   specific context of the case," so that every reasonable official would know "beyond debate" that

19   the challenged conduct was unlawful. City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S.

20   600, 611-13 (2015). A court considering a claim of qualified immunity must determine whether

21   the plaintiff has alleged the deprivation of an actual constitutional right and whether such a right

22   was clearly established such that it would be clear to a reasonable officer that his conduct was

23   unlawful in the situation he confronted. See Pearson v. Callahan, 555 U.S. 223, 236 (2009)

24   (overruling the sequence of the two-part test that required determining a deprivation first and then

25   deciding whether such right was clearly established, as required by Saucier v. Katz, 533 U.S. 194,

26   201 (2001)). The Court may exercise its discretion in deciding which prong to address first, in

27

28   _____
     [9] The Court only addresses qualified immunity as it relates to the retaliation claims because it is recommended
     summary judgment be granted on the deliberate indifference claim.

light of the particular circumstances of each case. <u>Pearson</u>, 555 U.S. at 236.  The Court must view the evidence in the light most favorable to the plaintiff. <u>See Martinez v. Stanford</u>, 323 F.3d 1178, 1184 (9th Cir. 2003).

Although both the "clearly established right" and "reasonableness" inquiries are questions of law, where there are factual disputes as to the parties' conduct or motives, the case cannot be resolved at summary judgment on qualified immunity grounds. <u>See Torres v. City of Madera</u>, 648 F.3d 1119, 1123 (9th Cir. 2011). "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury..., only in the absence of material disputes is it a pure question of law." <u>Id.</u> (internal quotation marks and citations omitted).

Defendants argue they are entitled to qualified immunity because they did not engage in any retaliatory conduct against Plaintiff.   For the reasons explained above, Plaintiff's allegations of retaliation raise questions of fact that preclude summary judgment on his retaliation claims against Defendants Eslick, Flores, and Satterfield.   Consequently, the factual question of Defendants' motive in rendering the above-described adverse actions prevents a finding that Defendants are entitled to qualified immunity upon the record presently before the Court.

**IV.**

**RECOMMENDATIONS**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim be GRANTED; and

2.      Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claims be DENIED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court, limited to 15 pages in length, including exhibits.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are

1  advised that failure to file objections within the specified time may result in the waiver of rights on

2  appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923

3  F.2d 1391, 1394 (9th Cir. 1991)).

4

5

6  IT IS SO ORDERED.

7  Dated:   **April 25, 2025**                    _____

8                                                 STANLEY A. BOONE
                                                   United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28